**GOOD GUSTAFSON AUMAIS LLP**
Christopher T. Aumais, Esq. (SBN 249901)
Ryan Gustafson, Esq. (SBN 220802)
2330 Westwood Boulevard, Suite 103
Los Angeles, California 90064
Phone: 310-274-4663
Fax: (310) 846-8938
Email: cta@ggallp.com
Email: jrg@ggallp.com
Email: service@ggallp.com

**MORROW LAW GROUP INC**
Gregory J. Morrow, Esq. (SBN 153224)
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Phone: 310-894-9149
Email: gregory.j.morrow@hotmail.com

*Attorneys for Plaintiff Christian Le Mai*

GOOD GUSTAFSON AUMAIS LLP

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHRISTIAN LE MAI, an individual,<br>Plaintiff,<br>v.<br>RTX CORPORATION, a Delaware corporation (doing business as RAYTHEON COMPANY and successors in interest to HUGHES AIRCRAFT COMPANY); PATRICIA HOUSE, an individual; SARAH BECK, an individual; and DOES 1 through 25, inclusive,<br>Defendants. | **CASE NO. 2:26-cv-05881-JAK-AYP**<br><br>**(Los Angeles Superior Court Case No.: 26STCV13100)**<br><br>**[PROPOSED] FIRST AMENDED COMPLAINT FOR:**<br>1. Retaliation (Cal. Lab. Code § 1102.5(b));<br>2. Retaliation (Cal. Lab. Code § 98.6(a));<br>3. Retaliation (Cal. Lab. Code § 6310(a));<br>4. Constructive Wrongful Termination in Violation of Public Policy;<br>5. Unlawful Harassment (Cal. Gov. Code § 12940 et seq.)<br>**DEMAND FOR JURY TRIAL** |

Plaintiff CHRISTIAN LE MAI ("Mai" or "Plaintiff"), an individual, on information and belief alleges and complains of Defendants RTX CORPORATION ("RTX"), a Delaware corporation (doing business as "RAYTHEON COMPANY" and successors in interest to "HUGHES AIRCRAFT COMPANY"), a publicly held company and leading aerospace and defense contractor, manufacturer, and supplier; PATRICIA HOUSE ("House"), an individual and employee of RTX; and SARAH BECK ("Beck"), an individual and employee of RTX, and each of them as follows:

GOOD GUSTAFSON AUMAIS LLP

## THE PARTIES

1. Plaintiff Mai is, and at all times relevant to this action was, a resident and citizen of the State of California. Plaintiff was formerly employed by Defendant RTX for approximately 28 years, initially hired by Defendants as a "Technical Staff Associate" by Hughes Aircraft Company, a California corporation, that was later acquired by Defendant RTX. Prior to his termination, Plaintiff Mai rose through the ranks of Defendant RTX, reaching the position of "Principal Specialist" in RTX's "Engineering Services" division.

2. Upon information and belief, Defendant RTX is, and at all times relevant to this action was, a corporation duly organized under the laws of the State of Delaware, and is one of the leading publicly held aerospace and defense contractors, manufacturers, and suppliers, with its principal place of business in Arlington, Virginia, and conducting business throughout California, including El Segundo, California.

3. Upon information and belief, Defendant House is, and at all times relevant to this action was, a resident and citizen of the State of Arizona and a managerial level employee with Defendant RTX.

4. Upon information and belief, Defendant Sarah Beck is, and at all times relevant to this action was, a resident and citizen of the State of California and an employee of Defendant RTX as Senior Manager, Human Resources Business Partner, working out of RTX's El Segundo, California facility, also known as "Raytheon Space and Airborne Systems", that is a critical corporate campus and employment center for RTX.

5. Defendants RTX, House, and Beck are hereinafter also collectively referred to as "Defendants."

6. The true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants named herein as DOES 1 through 25, inclusive, are presently unknown to Plaintiff, who therefore sues these Defendants by such fictitious names. Plaintiff will seek leave to amend this Complaint to allege their true names and capacities when the same have been ascertained.

## JURISDICTION AND VENUE

7. This action was originally filed in the Superior Court of the State of California,

County of Los Angeles, which is the chosen forum of Plaintiff, but was thereafter removed by Defendants to this Court. This First Amended Complaint asserts only claims arising under California law; no federal claim is asserted herein, and Plaintiff does not invoke this Court's federal-question jurisdiction. Thus, jurisdiction is proper in the Superior Court of the State of California, County of Los Angeles. This Complaint also adds Defendant Beck as a party defendant who, as a California citizen, will require remand to the Superior Court of the State of California, County of Los Angeles, as complete diversity of citizenship is no longer present as a result of the addition of Defendant Beck. This First Amended Complaint (FAC) is submitted with and in support of Plaintiff's Motion to Remand or, alternatively, Motion for Leave to Amend.

8. Plaintiff filed a timely charge of discrimination and harassment against Defendants with the California Civil Rights Department (CRD), formerly known as the Department of Fair Employment and Housing (DFEH), alleging, among other things, that Plaintiff was subject to discriminatory and disparate treatment, and was issued a "Right to Sue" notice as of April 14, 2026 (see attached Exhibit A).

9. Venue is proper in the Superior Court of the State of California, County of Los Angeles, because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district, and because Defendants, or some of them, reside in, are domiciled in, or regularly conduct business in this jurisdiction.

## STATEMENT OF FACTS

10. Plaintiff was formerly employed by Defendant RTX for approximately 28 years, initially hired by Defendants as a "Technical Staff Associate" by Hughes Aircraft Company, a California corporation, that was later acquired by Defendant RTX, and reaching his final position as "Principal Specialist" in the "Engineering Services" Division within RTX.

11. As a long-term employee of RTX, Plaintiff received various awards and accommodations for his superior job performance throughout his career, including a company achievement award as recently as on or about April 27, 2023.

12. Plaintiff also received a spot award from RTX as recently as on or about June 14, 2023.

GOOD GUSTAFSON AUMAIS LLP

13. Plaintiff has also been officially recognized by RTX for "exceptional service" approximately five (5) times since 2019.

14. Prior to being recently assigned to Defendant House as his "Manager" at RTX, Plaintiff received only positive and/or superior performance evaluations and reviews from his previous managers and was never subject to any form of employee discipline or "written up" on a Disciplinary Action Form (DAF).

15. All managers prior to Defendant House noted that Plaintiff fully met all employment requirements and, indeed, exceeded expectations.

16. At the time of his termination, Plaintiff was the only Vietnamese employee in his work area and identifies as a refugee.

17. On or about May 26, 2024, after years of positive reviews, Defendant House unilaterally issued a DAF to Plaintiff listing numerous alleged errors, mistakes, and deficiencies in Plaintiff's work since April 2024.

18. House did not provide Plaintiff with any fair warning, written or oral, of what were her expectations or performance requirements, training, or remedial action that House deemed to be allegedly necessary before moving toward with such disciplinary action including DAF.

19. Prior to issuing the DAF, House questioned Plaintiff about why the Integrated Program Management Report (IPMR) project checklist was in the Contract Data Requirement List (CDRL) internal data sharing system without her review and approval.

20. Plaintiff explained that the previous section lead and his manager, Rafael Moore ("Moore"), had repeatedly indicated that the project was not required to go through the CDRL and therefore did not require review or approval.

21. Plaintiff had previously placed IPMR checklists in the CDRL, but Moore did not review, correct, or approve such checklists prior to the project being delivered to the customer.

22. In Plaintiff's department within RTX, it is not uncommon for the manager to review such checklists and return a product for correction by staff if necessary.

23. As a long-term and dutiful employee, Plaintiff assumed this same procedure would apply under House, and thus placed the checklist in the CDRL where House had direct and



GOOD GUSTAFSON AUMAIS LLP

immediate access; however, House failed to review, revise, or approve it or request correction if necessary.

24. Instead, House called an impromptu meeting with Plaintiff, along with the department head and HR to discuss the IPMR checklist process.

25. Plaintiff complied with House's request to add her name in the checklist review notification.

26. After Plaintiff complied with House's request, House nevertheless issued a DAF and a Performance Improvement Plan (PIP), requiring excessive and onerous status reporting from Plaintiff that had never been requested by any of Plaintiff's prior managers or supervisors.

27. On or about May 15, 2024, RTX auditor Josh Hamilton ("Hamilton") issued a corrective action (CA) regarding RTX Data Management Operating Procedures (DMOP) markings.

28. The document "owner" for the DMOP at issue in the CA was Plaintiff's "backup" employee, Britnee Dean ("Dean"), who was also managed by House.

29. The CA was issued because that DMOP allegedly contained two markings (one "internal use only" and another "proprietary") instead of merely one proprietary RTX marking.

30. House's supposed "solution" to the CA was to replace the DMOP with a new document, removing the "internal use only" marking supposedly in violation of RTX company protocols and standard operating procedures (see attached as Exhibit B, "Request for Evaluation of Manager's Actions and Mitigation of Impact" letter from Plaintiff's former counsel and addressed to Defendants RTX, House, and other RTX managerial and/or supervisory employees, dated August 7, 2024).

31. As set forth in Exhibit B, Plaintiff's former counsel alleged that House's conduct as set forth above and herein, demonstrated discriminatory enforcement that was adverse to and specifically targeting Plaintiff and therefore constituted the application of a "double standard" but only as to Plaintiff.

32. On or about June 25, 2024, RTX internal compliance auditor Luz Bueno ("Bueno") held an audio call with Plaintiff regarding the alleged marking as set forth in the CA.

33. After learning that the project associated with the CA belonged to Dean, instead of



GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

Plaintiff, Bueno held an subsequent audio call with Dean as well as Plaintiff.

34. On or about June 26, 2024, Bueno set up a Zoom meeting with Dean and Plaintiff, but Dean did not attend, stating that her manager (i.e., Defendant House) directed that Dean to "not get involved with" the markings at issue in the CA.

35. House also wrongly attributed these markings exclusively to Plaintiff and omitted any reference to Dean.

36. Responding to an RTX CA requires significant employee time and effort on the part of Plaintiff, especially when attempting to correct another employee's work (i.e., Dean).

37. When the DAF was written and executed by House, her alleged "issues" of concern as briefly described in the DAF had already been fully resolved, such that there was no need to issue a DAF.

38. The DAF set forth latent criticisms of Plaintiff and was then placed in Plaintiff's employee personnel or human resources RTX record.

39. At all relevant times, House was Plaintiff's employer or a person acting on behalf of RTX within the meaning of California Labor Code sections 1102.5(b), 98.6(a), and 6310(a), and was a supervisor and/or employee who personally engaged in or participated in the harassing conduct alleged herein within the meaning of California Government Code section 12940.

40. On or about July 22, 2024, House issued a PIP that inexplicably required Plaintiff to report in 15-minute increments, provide weekly status and forecast updates, and participate in weekly performance reviews via Zoom.

41. These weekly Zoom performance reviews initially included Plaintiff, Defendant House, Courtney Giunta ("Giunta"), Sr. HR Manager at Raytheon Company[1], and Rachael Biederman, RTX's Associate Director, Data Management Department Lead.[2]

42. On or about August 2024, after Ms. Giunta went on maternity leave, Defendant Beck assumed HR responsibility for this ongoing employment action. Beck regularly reviewed,

[1] See: https://www.linkedin.com/in/courtneycanavan/

[2] See: https://www.linkedin.com/in/rachael-biederman-241269b8/

supervised, controlled, and ultimately terminated Plaintiff's employment with RTX, denying Plaintiff's desperate plea for RTX's reconsideration of his termination.

43. Indeed, Beck actively participated in every aspect of Mai's employment status with RTX, such as reviewing and discussing with Mai his PIP instituted by RTX as a pretext to Mai's eventual termination, including but not limited to, Beck's participation with weekly Zoom meetings that included, in order to discuss Mai's continued employment, ongoing work performance, as well as improvements (or supposed lack thereof) to such performance, ultimately resulting in his termination.

44. In an attempt to get clarity around why he had been targeted for this ongoing employer workplace discipline, Plaintiff called Beck via Microsoft Teams (the method of communication mandated by RTX) to ask Beck for the telephone number and other contact information for RTX's lawyer or other legal department personnel who were involved with this employer action so that Plaintiff could have his lawyer speak with RTX's lawyer; however, Beck rejected Plaintiff's request stating, to the effect, that "no, you can't have Raytheon's lawyer's number."

45. At the final stage leading up to Plaintiff being informed by Beck as to his termination, Plaintiff specifically asked Beck, to the effect, "I would like to appeal this decision (of termination)", but Beck responded that "the decision (to terminate Plaintiff's employment) has already been made." Beck went on to personally and repeatedly refused Plaintiff's request for an appeal under what he understood as RTX's employment policies and procedures, stating that, in essence, there was to be "no appeal" because a "final decision has already been made," Plaintiff's supposed 90 days had somehow expired, reiterating that RTX's determination was final. Upon hearing these statements, Plaintiff specifically asked Beck who made this final decision, but Beck curtly responded, "many people."

46. Beck's alleged conduct bears directly on Plaintiff's retaliation and related California state law claims, including his cogent and compelling claim under California Labor

Code § 1102.5(b), which, by its statutory language, strictly prohibits such retaliation and expressly applies to "**any person acting on behalf of the employer…**".

47. Moreover, as Senior Manager, Human Resources Business Partner, assigned to RTX's El Segundo, California facility, Beck personally participated in the adverse employment actions and the harassing conduct alleged herein.

48. At all relevant times, Beck was Plaintiff's employer or a person acting on behalf of RTX within the meaning of California Labor Code sections 1102.5(b), 98.6(a), and 6310(a), and was a supervisor and/or employee who personally engaged in or participated in the harassing conduct alleged herein within the meaning of California Government Code section 12940.

49. When he was unlawfully terminated from his long term employment in violation of California law, Plaintiff nevertheless pleaded with putative Defendant Beck for an adequate opportunity to appeal his termination pursuant to established RTX policies and procedures governing the employer/employee relationship as well as the rights of all its employees. But Beck adamantly responded by emphatically stating, to the effect, "there is no appeal…you're 90 days are up…this is a final determination!" In this context, it is important to acknowledge that Beck was acting in the capacity as RTX's Senior Manager and Business Partner, and was working out of RTX's El Segundo, California, Human Resources office.

50. These additional but totally unnecessary reporting requirements directly interfered with and negatively impacted on Plaintiff's workload, morale, as well as his mental health.

51. Since the issuance of the DAF and PIP, Plaintiff has experienced difficulty eating, sleeping, interacting with his friends and family, and has developed anxiety.

52. The excessive and unnecessary reporting and management demands imposed by House were not previously required of Plaintiff by any of his former managers or supervisors during his 28 year career with RTX and were intentionally designed to be time-consuming and emotionally burdensome on Plaintiff.

GOOD GUSTAFSON AUMAIS LLP

53. Plaintiff had previously and successfully managed up to 16 projects concurrently without any such reporting requirements or spontaneous management demands.

54. Plaintiff was not provided with any additional training or guidelines as to how to adjust to these new reporting requirements and management demands implemented by House.

55. The PIP form created by House also included language regarding "termination" which only exacerbated Plaintiff's stress, anxiety and mental duress.

56. House also "wrote up" Plaintiff for failing to order a camera and phone, allegedly in a "timely manner", despite Plaintiff's longstanding use of RTX internal "TeamsChat" for such communications.

57. On or about June 5, 2024, House emailed a RTX administrator to order a camera for Plaintiff's computer.

58. On or about June 10, 2024, House emailed the same RTX administrator, also including Plaintiff, on such email, requesting an update on the camera order and asked Plaintiff to order a phone.

59. The PIP also cited Plaintiff's supposed failure to respond, again, "in a timely manner," regarding the camera and phone order.

60. The RTX administrator did not respond for approximately five days regarding the camera order, and House did not comment on their supposed "timeliness" or lack thereof.

61. House relentlessly continued to harass Plaintiff by using the DAF to allege that Plaintiff was not meeting project deadlines, without ever specifying what projects or deadlines were allegedly involved or not being met.

62. Plaintiff was not given fair warning that "immediate" responses to manager requests, such as set forth above by House regarding phone and camera orders, were required or even necessary.

63. Prior to May 26, 2024, House continuously criticized Plaintiff's work and regularly spoke to him in a condescending tone, demanding and questioning even minor details, far more than any of Plaintiff's previous managers or supervisors.

64. House raised supposed "mistakes" after customer delivery, denying Plaintiff the

opportunity to correct such alleged errors in advance of such delivery.

65. House did not check or review Plaintiff's work until after it was delivered to RTX customers.

66. RTX Quality Assurance department was also responsible for checking and reviewing work product, including those products worked on by Plaintiff, but such alleged mistakes and errors noted by House were not caught or identified by Quality Assurance in advance of customer delivery.

67. There was no subsequent action plan created or implemented between House, the Quality Assurance department, and Plaintiff, in order to coordinate and review the work performed by Plaintiff in advance of delivery.

68. The alleged "errors" or supposed "failures" were not frequently repeated by Plaintiff.

69. Plaintiff was not the sole individual employee responsible for reviewing and checking all work product prior to delivery to RTX customers and, indeed, Quality Assurance as well as House also shared such responsibility.

70. House's supposed concerns and criticisms about Plaintiff's job performance were communicated orally to Plaintiff in the direct presence of other employees and were not put in writing.

71. House proceeded directly to disciplinary action by unilaterally issuing the DAF and then the PIP without any prior consultation with Plaintiff.

72. Plaintiff was assigned responsibility for over approximately twenty (20) programs, while other RTX employees under the same manager (House) working in the same or comparable position as Plaintiff were each assigned no more than five (5) programs, except one employee who had no more than ten (10) programs.

73. Plaintiff's prior counsel (see Exhibit B) was not informed of any concerns or what RTX Human Resources would like to see as to Plaintiff's performance moving forward before his spontaneous and unilateral termination.

74. From on or about October 15–21, 2024, Plaintiff was subject to Superior Court summons to serve as a juror.

75. On October 16 and October 17, 2024, while Plaintiff was actively serving as a juror,

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

House texted and emailed Plaintiff asking him to immediately contact her, and House later used Plaintiff's alleged lack of response as a basis for criticism and subsequent disciplinary action.

76. On or about October 22, 2024, Defendant Beck terminated Plaintiff's employment with RTX.

77. At the time of his termination, Plaintiff was approximately 60 years old and was looking forward to eventually reaching the required retirement age so that he would then be entitled to receive his earned pension and severance pay based on his many years of service as a dedicated employee with RTX.

78. Plaintiff did not receive any required workers' compensation paperwork regarding his ongoing mental health condition caused by workplace stress as set forth above, and instead was merely directed to contact RTX's El Segundo Health Center.

**FIRST CAUSE OF ACTION**

**(Retaliation in Violation of California Labor Code § 1102.5(b))**

**(By Plaintiff Against All Defendants)**

79. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

80. At all relevant times, Plaintiff was an employee of Defendants, and Defendants were Plaintiff's employer or persons acting on behalf of such employer within the meaning of California Labor Code § 1102.5(b).

81. Plaintiff engaged in protected activity by disclosing information to persons with authority over him, including HR, management, and others, regarding conduct he reasonably believed to constitute violations of law, company practices and policy, or regulations, including but not limited to concerns about selective enforcement, application of double standards, and improper corrective actions by management, as well as repeated requests for review and mitigation of management actions that Plaintiff reasonably believed were unlawful or improper.

82. Defendants subjected Plaintiff to adverse employment actions, including but not limited to the issuance of, for the very first time in his career with RTX, a Disciplinary Action Form (DAF), placement on a Performance Improvement Plan (PIP) setting forth onerous and excessive

but unnecessary requirements, and ultimately termination of his long-term employment.

83. There is a direct causal link between Plaintiff's protected disclosures and the adverse employment actions taken against him, as evidenced by the temporal proximity between Plaintiff's complaints and Defendants' actions and omissions, Defendants' knowledge of Plaintiff's protected activity, and the pattern of escalating and targeted discipline following Plaintiff's disclosures.

84. As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**(Retaliation in Violation of California Labor Code § 98.6(a))**

**(By Plaintiff Against All Defendants)**

85. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

86. Plaintiff engaged in protected activity under the Labor Code by making complaints regarding workplace conditions, management conduct, and requesting review of disciplinary actions and performance evaluations.

87. Defendants subjected Plaintiff to adverse employment actions, including but not limited to the issuance of a DAF, placement on a PIP, and ultimately termination of employment.

88. There is a direct causal connection between Plaintiff's protected activity and the adverse employment actions, as Defendants were aware of Plaintiff's complaints and discipline and termination followed closely thereafter in time.

89. As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**(Retaliation in Violation of California Labor Code § 6310(a))**

**(By Plaintiff Against All Defendants)**

90. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91. Plaintiff engaged in protected activity by making good faith complaints regarding

workplace safety, including concerns about improper corrective actions, documentation protocols, and the handling of audit findings and corrective actions.

92. Defendants subjected Plaintiff to adverse employment actions, including discipline, placement on a PIP, and termination.

93. There is a direct causal link between Plaintiff's protected activity and the adverse employment actions as set forth herein and above, as Defendants' actions followed Plaintiff's complaints and Defendants were aware of those complaints.

94. As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**

**(Constructive Wrongful Termination in Violation of Public Policy)**

**(By Plaintiff Against Defendants)**

95. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

96. By subjecting Plaintiff to virtually continuous and unreasonably harsh conditions in excess of those faced by his coworkers, including but not limited to baseless, harsh, and unfair criticisms in front of or in close proximity to other employees, Defendants intentionally created or knowingly permitted work place conditions that were so intolerable or aggravated that Defendants knew or should have known that a reasonable person in Plaintiff's position would be compelled to resign from employment.

97. It is the policy of the State of California, as expressed in the California Fair Employment and Housing Act and the California Labor Code, that an employee shall not be subjected to disparate treatment on account of their race, ethnicity, or refugee status, nor retaliated against for engaging in protected activity.

98. As a direct and proximate result of Plaintiff's constructive termination in violation of public policy, Plaintiff has suffered and continues to suffer extreme and severe mental and physical anguish and emotional distress, causing Plaintiff to incur healthcare expenses for treatment of these conditions and for other ancillary and related costs and expenses, entitling Plaintiff to general

GOOD GUSTAFSON AUMAIS LLP

compensatory damages.

99. As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**(Unlawful Harassment in Violation of Government Code § 12940 et seq.)**

**(By Plaintiff Against RTX, House, and Beck)**

100. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

101. Because Plaintiff is a member of an identifiable racial and ethnic class, he became the object of Defendants' application of double standards, mockery, intimidation, and ridicule in front of Plaintiff's coworkers, creating a hostile work environment.

102. Defendant House personally participated in the harassing conduct, all as alleged herein, including but not limited to: issuing completely unwarranted DAFs and PIP, requiring excessive and onerous status reporting from Plaintiff that had never been requested by any of Plaintiff's prior managers or supervisors; requiring Plaintiff to report in 15-minute increments, provide weekly status and forecast updates, and participate in weekly performance reviews via Zoom; "writing up" Plaintiff for alleged violations of her directives despite Plaintiff's adherence to same; using such employer disciplinary actions as pretext to terminating a long-standing 28 year employee of RTX prior to his eligibility for retirement benefits; and colluding with other members of RTX management to purposefully target Plaintiff for termination.

103. Defendant Beck personally participated in the harassing conduct, all as alleged herein, including but not limited to: denying Plaintiff's request for contact information of the RTX's legal counsel so that Plaintiff's lawyer could contact such counsel directly to discuss Plaintiff's employment review and status; rejecting Plaintiff's repeated request for an appeal of Beck's decision to terminate Plaintiff's employment; failing to disclose the decision making process leading up to Plaintiff's termination of employment and who on behalf of RTX specifically participated in that process; using such employer disciplinary actions as pretext to terminating a long-standing 28 year employee of RTX prior to his eligibility for retirement benefits; and colluding with other members

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

of RTX management to purposefully target Plaintiff for termination.

104. Under California Government Code § 12940(j)(3), an employee of an entity subject to the FEHA is personally liable for any harassment prohibited by the statute that is perpetrated by the employee, regardless of whether the employer knew or should have known of the conduct and failed to take immediate and appropriate corrective action.

105. Such outrageous and reprehensible conduct on the part of Defendants as described herein and above was done with malice, oppression, and fraud and with conscious disregard for Plaintiff's rights, with the intent and design and purpose of belittling and injuring Plaintiff.

106. Defendants, through their officers, supervisors, managers, employees and agents, authorized and condoned and/or ratified the egregious and unlawful conduct as set forth herein and above.

107. By reason thereof, Plaintiff is entitled to recover punitive and/or exemplary damages from and against Defendants.

108. As a direct and proximate result of Defendants' acts and omissions in violation of Government Code § 12940 et seq., Plaintiff was compelled and will continue to incur legal fees and costs, entitling Plaintiff to recover such fees and costs pursuant to Government Code § 12965.

109. As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Christian Le Mai respectfully requests that this Court enter judgment in his favor and against Defendants RTX Corporation, Patricia House, and Sarah Beck as follows:

1. Declare that Defendants violated Plaintiff Christian Le Mai's rights under California Government Code § 12940 and California Labor Code §§ 1102.5(b), 98.6(a), and 6310(a), and other applicable laws as alleged throughout this Complaint;

2. Enjoin Defendants from engaging in further unlawful retaliation and harassment against Plaintiff Christian Le Mai or any other employee on the basis of protected activity, race, or national origin, and require Defendants to implement appropriate policies, training, and monitoring

to prevent future violations;

3. Direct Defendant RTX Corporation to promptly reinstate and restore Plaintiff Christian Le Mai to his former position or a comparable position, or in the alternative, award front pay in lieu of reinstatement, as permitted by law;

4. Award Plaintiff general, compensatory, and special damages according to proof at trial;

5. Award Plaintiff punitive and/or exemplary damages against Defendants according to proof at trial;

6. Award Plaintiff reasonable attorneys' fees and costs of suit, including pursuant to California Government Code § 12965 and California Labor Code § 1102.5(j);

7. Award Plaintiff prejudgment and post judgment interest as permitted by law; and

8. Award such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff Christian Le Mai hereby demands a trial by jury on all causes of action and issues so triable.

DATED: September 14, 2026

**GOOD GUSTAFSON AUMAIS LLP**
**MORROW LAW GROUP INC**

By: *__/s/Gregory J. Morrow__________*
Ryan Gustafson
Gregory J. Morrow
Christopher T. Aumais
*Attorneys for Plaintiff Christian Le Mai*

# EXHIBIT A

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency
GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

April 14, 2026

Ryan Gustafson
2330 Westwood Blvd., Ste. 103
Los Angeles, CA 90064

RE: **Notice to Complainant's Attorney**
CRD Matter Number: 202604-34497810
Right to Sue: Mai / Raytheon Technologies

Dear Ryan Gustafson:

Attached is a copy of your complaint of discrimination filed with the Civil Rights Department (CRD) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq. Also attached is a copy of your Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these documents on the employer.** You must serve the complaint separately, to all named respondents. Please refer to the attached Notice of Case Closure and Right to Sue for information regarding filing a private lawsuit in the State of California. A courtesy "Notice of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

April 14, 2026

RE: **Notice of Filing of Discrimination Complaint**
CRD Matter Number: 202604-34497810
Right to Sue: Mai / Raytheon Technologies

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil Rights Department (CRD) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. You may contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency
GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

April 14, 2026

Christian Mai
,

RE: **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202604-34497810
Right to Sue: Mai / Raytheon Technologies

Dear Christian Mai:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective April 14, 2026 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

This matter may qualify for CRD's Small Employer Family Leave Mediation Program. Under this program, established under Government Code section 12945.21, a small employer with 5 -19 employees, charged with violation of the California Family Rights Act, Reproductive Loss Leave, or Bereavement Leave (Government Code sections 12945.2, 12945.6, or 12945.7) has the right to participate in CRD's free mediation program. Under this program both the employee requesting an immediate right to sue and the employer charged with the violation may request that all parties participate in CRD's free mediation program. The employee is required to contact the Department's Dispute Resolution Division prior to filing a civil action and must also indicate whether they are requesting mediation. The employee is prohibited from filing a civil action unless the Department does not initiate mediation within the time period specified in section 12945.21, subdivision (b) (4), or until the mediation is complete or is unsuccessful. The employee's statute of limitations to file a civil action, including for all related claims not arising under section 12945.2, is tolled from the date the employee contacts the Department regarding the intent to pursue legal action until the mediation is complete or is unsuccessful. Contact CRD's Small Employer Family Leave Mediation Pilot Program by emailing DRDOnlinerequests@calcivilrights.ca.gov and include the CRD matter number indicated on the Right to Sue notice.

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency
GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws if one exists in your area that is authorized to accept your complaint. If you decide to file with a local agency, you must file before the deadline for filing a lawsuit that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

# COMPLAINT OF EMPLOYMENT DISCRIMINATION
# BEFORE THE STATE OF CALIFORNIA
## Civil Rights Department
## Under the California Fair Employment and Housing Act
## (Gov. Code, § 12900 et seq.)

**In the Matter of the Complaint of**
Christian Mai CRD No. 202604-34497810
Complainant,
vs.

Raytheon Technologies
,

Respondents

---

**1.** Respondent **Raytheon Technologies** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Christian Mai**, resides in the City of **,** State of **.**

**3**. Complainant alleges that on or about **October 24, 2024**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's ancestry, sex/gender, age (40 and over), association with a member of a protected class.

**Complainant was discriminated against** because of complainant's ancestry, age (40 and over), association with a member of a protected class, race (includes hairstyle and hair texture), leave to serve on a jury or appear in court and as a result of the discrimination was terminated, demoted, denied work opportunities or assignments, denied leave to serve on a jury or appear in court, given additional work responsibilities or assignments.

**Complainant experienced retaliation** because complainant requested or used leave to serve on a jury or appear in court and as a result was terminated, denied hire or promotion, demoted, denied any employment benefit or privilege, denied leave to serve on a jury or appear in court.

**Additional Complaint Details:**

VERIFICATION

I, **J. Ryan Gustafson**, am the **Attorney** in the above-entitled complaint. I have read the foregoing complaint and know the contents thereof. The matters alleged are based on information and belief, which I believe to be true. The matters alleged are based on information and belief, which I believe to be true.

On April 14, 2026, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Los Angeles CA**

# EXHIBIT B

***Dina L Nguyen, Esq***
*Of Counsel:*
*Mark S. Rosen, Esq. Brenda F. Fizer, Esq. Phillip Sandoval, Esq. Nina C. Nantha, Esq.*

Business & Law Center Dina L. Nguyen, ESQ
9191 Bolsa Avenue, Suite 206, Westminster, Ca 92683
Office: (714) 657-2425
Email: DinaLinhEsq@gmail.com

August 7, 2024

RTX
Maggoe Greco, Director HR Partner
Email: Margaret.Greco@rtx.com
Courtney Canavan, Senior Manager HR Partner
Email: Courtney.Canavan@rtx.com

Re:
RTX employee: Christian Mai
Concern: Patricia House, Manager, Engineering Services

REQUEST FOR EVALUATION OF MANAGER'S ACTION
AND MITIGATION OF IMPACT

Dear HR Director and Manager:

Please take notice that our office represents Mr. Christian Mai in the referenced matter. There is no pending claim or complaint at this time. This letter is notice and a request to review Ms. Patricia House's management decisions and actions towards Mr. Christian Mai, Principal Specialist, Engineering Services.

Before we begin our discussion of the issues of concern, we would like to share the history of Mr. Mai as a long term employee of Raytheon Technologies (Company). This year, Mr. Mai is heading towards 28 years of service for the Company. He is a loyal and dedicated employee and would like to continue working for Raytheon until he reaches 30 years of service. His last achievement award from the Company was on or about April 27, 2023, and his last spot award from the Company was on or about June 14, 2023. He has been officially recognized for exceptional service approximately 5 times since 2019. He has had approximately 10 managers since his employment with the Company. Before his being assigned to Manager Patricia House, he received all good reviews and performance evaluations from previous managers and was never written up on a

Disciplinary Action Form (DAF). His employment record should reflect that all managers, prior to Ms. House, noted either Mr. Mai met all requirements or exceeded expectations. Mr. Mai is the only Vietnamese in his work area, and he is very proud of his background as a refugee who worked hard to be employed at Raytheon.

We want to direct your attention to the management style of Ms. House. Currently, it fails to bring out the exceptional qualities in Mr. Mai performance, as he has done in the past. As a result, the current management style may affect production for the Company. Particularly, in her May 26, 2024 DAF, Ms. House listed numerous errors, mistakes and deficiencies in Mr. Mai's work since April of 2024. After this office review the list, it appears that the DAF was intended to put down performances instead of constructively building employee moral and motivation to meet expectations. In my years of writing performance evaluations and reviewing PIP's, I have not seen performance issues being laid out so unconstructively as the DAF and PIP written by Ms. House for Mr. Mai. Moreoever, Ms. House did not give fair warning of her expectations and training to Mr. Mai before orchestrating towards disciplinary action.

Prior to issuing DAF, Ms. House inquired of Mr. Mai why the Integrated Program Management Report (IPMR) project checklist is in the Contract Data Requirement List (CDRL) internal data sharing system without her review and approval? Mr. Mai's explanation is that the previous section lead, Mr. Rafael Moore, indicated to him that the project is not required to go through CADE. Therefore, Mr. Moore previously did not require Mr. Mai to submit the checklist for review and approval. Notwithstanding Mr. Moore did not require review and approval of the IPMR checlist, Mr. Mai still placed IPMR checklists through the (CDRL), but Mr. Moore did not review, correct or approve the checklist prior to the project being delivered to the customer. When Mr. Moore does not review the checklist, Mr. Mai would not have known to correct any errors previously submitted to the CDRL. It is not uncommon, in Mr. Mai's department, for the manager to review the checklist and return a product for correction by staff.

In assuming the procedure for the IPMR project is the same as Mr. Moore has explained to him, Mr. Mai placed the checklist in the Contract Data Requirement List (CDRL) application which is shared with Ms. House. As a result, Ms. House saw the checklist prior to the product going to the customer, but she did not review and approve the checklist. Instead of just reviewing the checklist and advising Mr. Mai to remember to add her name in CDRL reviewer notification, Ms. House called a meeting with Mr. Mai, the department and head, herself and HR to discuss the Integrated Product Management Review (IPMR) checklist process. From our standpoint, a concern about performance, first, must be discussed with the employee without HR involvement. The initial meeting with HR was set despite that Mr. Mai has complied with Ms. House's request to add her name in the checklist review notification. We questioned if this procedure is of a crucial nature, because Ms. House responsibility as lead is to review and approve products, and, as such, she has access to all of the work for the employees she supervises. Nevertheless, following this meeting with HR and after Mr. Mai has complied with Ms. House's request, Ms. House intimidated Mr. Mai with a DAF report and then an unreasonable PIP requiring excessive status reporting.

On or about May 15, 2024, Mr. Mai was issued a corrective action notice (CA) by auditor Josh Hamilton. Please note that CA are common for Mr. Mai's area of work. However, the person who is the owner and worked on this document was Mr. Mai's backup, Ms. Britnee Dean. Ms. House is also Ms. Dean's manager. The internal auditor issued the CA, because data management operating procedure (DMOP) has 2 markings (1 for internal use only and 1 for Raytheon proprietary) instead of 1 marking fo Raytheon proprietary. Ms. House solution was to correct the CA by replacing the DMOP with a new document removing the "internal use only" marking and keeping the Raytheon proprietary marking as if the new document has already been reviewed by the auditor. This corrective action is against company's policy and protocal for preserving the work history of staff. Ms. House's arbitrary and selective conduct gives the appearance to Mr.Mai that management has a double standard when it comes to abiding by the Company's protocals and policies. Having experienced this with Ms.House, then being written up for expected errors and omissions which could be resolved each time with a simple email or a phone call, can have a negative impact on a employee moral and may create unnecessary work for the employee and the manager.

On or about June 25, 2024, Mr. Mai had an audio call meeting with Ms. Luz Bueno, an internal compliant auditor, because of the marking CA discussed above. After learning that the project belonged to Ms.Brittnee Dean, Ms. Luz Bueno had an audio call with Ms. Dean and Mr. Mai. On or about June 26, 2024, Ms. Bueno set up a Zoom meeting with Ms. Dean and Mr. Mai. However, Ms. Dean did not attend the Zoom meeting. Ms. Dean responded to Ms. Luz via Teams Message application that her manager directed her not to get involve with the marking corrective notice (CA). Aside from Ms. House having the responsibility to review the IPMR project in the CDRL application, the Company also has an audit department that is responsible for reviewing CA's. However, Ms House, inputed the CA for the markings exclusively to Mr. Mai and left out Ms. Dean. Please take notice that each time a CA is issued, it takes a lot of time for staff to communicate to the in house auditor as to the correction, especially in cases where one employee is being asked by his manager to correct another employee's work. Mr. Mai has been a team player and wants to help out his teammates, but not when the error would go against Mr. Mai's work record and manager is does not take ownership of her action.

In fact, when the DAF was written and executed by Ms. House, the issues of concern in the DAF was already resolved previous to it being written. Instead of saying, "Thank you for correcting the errors. I want you to keep focus on your work and continue to give extra attention to what could have caused the errors. You will have more time for your projects if these errors could be avoided", Ms. House made the decision to penalize Mr. Mai by issuing a DAF filled with unconstructive criticisms and put downs which would be put in his almost perfect personnel record. This has caused Mr. Mai alot of distress. On top of that, on or about May 26, 2024, a Performance Improvement Plan (PIP) with unrealistic goals like reporting to Ms. House in 15 minute increments of work he is performing AND 1. weekly status; 2. weekly forecast 3. Participate in performance review weekly. This schedule of additional tasks will definitely interfere with Mr. Mai's work load, work moral and mental health. Since Ms. House's issuing of the DAF and PIP, Mr. Mai can

sustain his work, but he cannot eat, cannot sleep and has developed anxieties.

Despite Mr. Mai being fully capable of performing his work, these demands are micro managing, time consuming and emotionally burdensome for an employee in Mr. Mai's position. He has been in this position and working independently for almost 28 years. Additional time is needed to perform the extra reportings to the manager. These are tasks that he was not required to perform previous to Ms. House becoming his manager. These tasks will also impact the time he can devote to the projects that are being assigned to him. Per Mr. Mai's previous performance evaluations, he was capable of managing 16 projects concurrently without issues when he was not required to do these additional time consuming tasks. He needs to be trained to change his work schedule to include these reporting requirements imposed by Ms. House instead of being written up. At the bottom of the PIP form, there is phrase regarding "termination" which is very intimidating to any employee. The motivation to improve performance is through the fear of termination rather than through the mission and purpose of the Raytheon Technologies.

In addition, Ms. House went to the extent of writing Mr. Mai up for failing to order camera and phone in a timely manner. Mr. Mai has been communicating through TeamsChat for over 2 decades and this communication system is still in place. This is another minor matter that could have been resolved via a phone call or email. On or about June 5, 2024, Ms. House via email asked the adminstrator to order to order a camera for Mr. Mai's computer. On or about June 10, 2024, Ms. House emailed the administrator and Mr. Mai that she wanted an update on the camera order and asked Mr. Mai to order a phone. In her PIP review, Ms. House mentioned this incident as a failure to respond in a "timely" mannor. Mr. Mai work in a very busy environment where it is common for a request to be repeated as there are many time pressing projects to be delivered to customers on a daily basis by Raytheon. Here lies another double standard by Ms. House. Adminstration does not respond for 5 days about the camera order and nothing was said about "timely response". Ms. House had to email Administration to ask for the status. The sudden need to order a computer camera and phone for Mr. Mai confirms Ms. House desire to account continuously how Mr. Mai uses his time. Request for status in and of itself is not unreasonable. However, when it's used excessively and causes delays in work production, the request becomes unreasonable. If the phone and camera do arrive, it is requested that the Company does not allow the usage of the camera and phone as employee tracking devices to intimidate the free working spirit of the employee. To allow such action is equivocal to abuse of communication devices to harass employees.

Further, Ms. House added in her DAF that Mr. Mai is not meeting deadlines without specifying for what project? or what the deadlines are for? If he has taken corrective action? It appears to us but we are not certain if the deadlines are for Mr. Mai to return email inquiries about the phone and camera or other matters? As to this matter, it has been the practice for employees, in Mr. Mai's work area, to have a few email reminders before a response is in place. After years of this culture, Mr. Mai did not get fair warning that he is required to respond immediately to his manager about phone and camera orders. No one in the past, in the work force, has made any of Mr. Mai's response an issue. In the

past, a reminder for response in an email is not indicative that the response late. Sometime, it takes time to review the emails, because another project has more priority.

Prior to May 26, 2024, Ms. House continuous criticized Mr. Mai's work and orally spoke to him in a condescending tone by demanding and questioning every details substantially more than his previous managers. There is an implication of bias and a feel of arbitrary and selective treatment, but he does not know how to describe the tone of Ms. House communication. He concluded the communications from Ms. House was condescending, because Ms. House tried to put him down for his mistakes instead of constructively explain the errors and give him an opportunity to correct the errors. Whether it was her preference or intentional, Ms. House always approached Mr. Mai with mistakes after the work has already been sent out to the customers; thus, he was not given the fair opportunity to correct the alleged errors. This is indicative that Ms. House intentionally does not check Mr. Mai's work until it has gone out to the customers. We question, "Why does the manager not check the work before it goes out to the customer? If she spends the time to check the work, would it not be more productive to check before the work is sent out?" The Company also has an Quality Assurance department that is concertedly responsible for work products. However, Ms. House did not take into account that the errors and ommissions were not caught by Quality Assurance Department as they should have been.

An action plan was needed to coordinate the work of Mr. Mai, Ms. House and the Quality Assurance Department and that plan was not put in place by the manager. Ms. House failed to propose or suggest any such plan. The alleged errors were not frequently repeated errors on Mr. Mai's part. Traditionally, Mr. Mai is not the sole person who is responsible for review and checking products prior to delivery to customers. Mr. Mai, the manager and staff in other departments are team members who are concertedly responsible for the review of the products. There is no previous written warnings for Mr. Mai to perform otherwise. The performance involves detailed technical issues; concerns should be put in writing and not communicated orally among the presence of other employees and among other issues not involving Mr. Mai's performance as Ms. House has been doing. Unfortunately, Ms. House went directly to disciplinary action by issuing the DAF then the PIP. Please review the DAF and PIP report in the employee's personel file.

Based on the foregoing, we are requesting the following action on Mr. Mai's behalf and for Mr. Mai's physical and emotional well being:

- ALL employees under Ms. House will be given training and notice as to expected protocals relating to quality assurance before any disciplinary action. Mr. Mai will be given a fresh start as if no DAF or PIP has been written up against him;
- For as long as Mr. Mai is under Ms. House's management, she will treat him in the same manner as she treats other employees under her management;
- Ms. House is to modify the schedule for status reporting to the manager so that it would not interfere with time employees need to allocate for the projects assigned

to them. HR can assist by taking survey of employees on this matter. The reporting standard should apply to ALL employees;

- ALL employees under Ms. House's management should be required to have cameras and phones assigned to them not just Mr. Mai;
- An accomodation that HR create status reporting forms for ALL employees to use, and employees will be given training on filling out status reporting form;
- Ms. House be given training on how to write positive moral building employee evaluations;
- Ms. House attend ethics training and classes on avoiding implication of bias in the workforce;
- Mr. Mai be allowed to work under another manager where the work environment is less hostile and arbitrary.

We are optimistic that this notice and request for review of the manager's actions will be useful for the Company's operation and the development of employees. It is important that all employees are afforded a non-hostile and non-arbitrary management system. Please contact our office should you have any concerns.

Very Truly Yours,

Dina L Nguyen, Esq
Attorney for Christian Le Mai